AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

ALFREDO ROJO DOMINGUEZ,

Defendant.

FILED
CLERK, U.S. DISTRICT COURT
03/17/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___KL___ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
3/17/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CD___ DEPUTY

Case No.   2:23-mj-01279-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 9, 2023, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1): | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Aaron H. Johnson, DEA Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 17, 2023

*Alicia G. Rosenberg*
Judge's signature

City and state: Los Angeles, California

Hon. Alicia G. Rosenberg
Printed name and title

AUSA: Laura A. Alexander x1019

AFFIDAVIT

I, Aaron H. Johnson, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Alfredo Rojo Dominguez ("DOMINGUEZ") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of applications for warrants to search 7437 El Tomaso Way, Buena Park, California 90620 (the "SUBJECT PREMISES") as described more fully in Attachment A-1; a gray, 2021 Jeep Cherokee bearing California license plate number 8BZQR555 and Vehicle Identification Number ("VIN") 1C4RJFAG8MC812007 (the "SUBJECT VEHICLE") as described more fully in Attachment A-2; and the person of DOMINGUEZ, as described more fully in Attachment A-3.

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are approximate.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since March 2019. I am currently assigned to the Los Angeles Field Division, Enforcement Group 4. While employed by the DEA, I have received extensive training regarding federal law, including federal firearms and narcotics offenses. I regularly refer to these laws during the course of my duties and have participated in the execution of several state and federal search and arrest warrants in violation of these laws. I also completed formal training at the DEA Training Academy in Quantico, Virginia, where I received specialized training in various surveillance and investigative techniques related to organized crime and narcotics trafficking, among other things. I have also participated in numerous DEA investigations into drug trafficking, including investigations involving confidential sources and cooperating witnesses. Before I worked for the DEA, I served as a Michigan State Trooper for the Michigan State Police where I participated in numerous narcotics

investigations and arrests. I also interviewed numerous witnesses and suspects regarding drug-related activities.

6. Based on my training and experience, I am familiar with the methods of operation utilized by drug traffickers and drug trafficking organizations, including the distribution, storage, and transportation of narcotics, and the collection of monetary narcotics proceeds. I am also familiar with methods employed by large drug organizations to thwart detection by law enforcement, including the use of debit calling cards, public telephones, cellular telephone technology, mobile applications, electronic messenger/messaging systems, voice over internet phone technology, pagers, counter surveillance, encrypted devices, false, fictitious, or stolen identities, and coded communications.

7. In conducting investigations with the DEA, I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations and the methods in which these organizations operate. I have also participated in various aspects of these investigations, including making and directing controlled purchases of dangerous drugs, conducting physical and electronic surveillance, using informants and cooperating sources, executing search warrants, executing arrest warrants, participating in consensual searches, installing and utilizing GPS devices, and installing and utilizing electronic recording devices. I have used a variety of investigative techniques and resources, including surveillance, confidential sources, search warrants, telephone

toll analysis, and wire/electronic intercept communications analysis.

### III. SUMMARY OF PROBABLE CAUSE

8.  On February 5, 2023, a DEA confidential source[1] ("CS") working under the direction and supervision of the DEA sent a recorded text message to E.G., a drug broker located in Mexico, to express interest in purchasing 15 pounds of methamphetamine in Los Angeles. E.G., who believed the CS was a drug customer, responded and told the CS that he could sell 15 pounds of methamphetamine to the CS for $650.00 per pound. E.G. also told the CS that he would send the CS's number to "the guy," who would complete the transaction with the CS in Los Angeles.

9.  On February 6, 2023, an unknown Hispanic individual, later identified as DOMINGUEZ, called the CS regarding the methamphetamine transaction. DOMINGUEZ believed the CS was a drug customer. The following day, DOMINGUEZ called the CS again, and told the CS to meet him at the Citadel Outlets,

---

[1] The CS, a Mexican national, began working with the DEA in 2013. The CS began working with the DEA after s/he was convicted of possession of marijuana for sale and illegal re-entry into the United States following deportation or removal. From 2019 until his/her deactivation in early 2022, the CS also acted as a confidential source with Homeland Security Investigations. The CS is working with the DEA in exchange for monetary compensation, deferred action on his/her immigration status, and for permission to enter and remain in the United States. The CS's criminal history only includes the aforementioned convictions for possession of marijuana for sale and illegal re-entry into the United States following deportation or removal. To date, the CS has been paid approximately $830,908 for information s/he provided to DEA investigators. Since 2013 s/he has assisted in investigations resulting in the seizure of approximately thousands of pounds of narcotics and millions of dollars.

4

located at 100 Citadel Dr., Los Angeles, CA 90040, to complete the methamphetamine transaction.

10. On February 7, 2023, DOMINGUEZ sold approximately 8.050 kilograms, or 17.74 pounds, of methamphetamine for $9,750 to the CS. DOMINGUEZ drove the SUBJECT VEHICLE to the transaction from his residence, the SUBJECT PREMISES. After the transaction, DOMINGUEZ drove the SUBJECT VEHICLE back to the SUBJECT PREMISES.

### IV. STATEMENT OF PROBABLE CAUSE

11. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Background of Investigation**

12. Based on my conversations with DEA Special Agent Carlos Duran, I know that on February 5 2023, the CS placed a recorded text message to E.G., a drug broker located in Mexico, and told him that s/he was looking to purchase 15 pounds of methamphetamine in Los Angeles.[2] E.G. stated that "waters" were $650 per pound. Based on my training and experience, I know "waters" to be coded language for methamphetamine. The CS stated that s/he wanted to purchase 15 pounds of methamphetamine. E.G. stated that he would send the CS's number to "the guy" so that the CS and "the guy" could arrange the transaction. During the CS's text conversation with E.G., the CS provided his/her phone number to E.G. The CS instructed E.G.

---

[2] Unless otherwise indicated, all voice and text communications wherein the CS is a party were recorded.

to have "the guy" contact him/her any time after 10 a.m. and to ask for "inge." Based on my training and experience, I know this to be coded language drug traffickers use to ensure they are speaking with the correct individual. In this case, "the guy" would provide the CS with the correct code word, "inge," to confirm the nature of the communication. According to the CS, after his/her conversation with E.G., E.G. provided the CS's phone number to DOMINGUEZ, who used the phone number 213-526-6819.

13. According to notes, reports and my conversations with Agent Duran, who had previously communicated with the CS, on February 6, 2023, a person initiated contact with the CS from phone number 213-526-6819. As explained further below, I believe this person to be DOMINUGEZ.

14. Law enforcement ran phone number 213-526-6819 through multiple law enforcement and open-source databases, and learned that this phone number was associated with DOMINGUEZ, at address 7437 El Tomaso Way, Buena Park, California 90620 (the "SUBJECT PREMISES").

15. On February 6, 2023, on a recorded line, calling from phone number 213-526-6819, DOMINGUEZ told the CS that s/he was calling for the "*inge*," which according to Agent Duran, is Spanish for "engineer." Based on my training and experience, I understand that DOMINGUEZ used this word as a code word to reference the methamphetamine transaction. During DOMINGUEZ's conversation with the CS, he told the CS that he would send an

6

address at a later time for the transaction. DOMINGUEZ stated that he was located near Buena Park and Bellflower.

16. According to notes and reports and based on my conversations with Agent Duran, on February 7, 2023, the CS informed Agent Duran that DOMINGUEZ had called him/her to arrange to meet in person. During the phone call, the CS and DOMINGUEZ agreed to meet the following day, in Commerce, CA, to complete the 15-pound methamphetamine sale.

### B. February, 8 2023: DOMINGUEZ Sells the CS Approximately 15 Pounds of Methamphetamine

17. According to recorded text messages, reports, and my conversation with Agent Duran, on February 8, 2023, at approximately 10:24 a.m. EST, DOMINGUEZ texted the CS, "At 11 I'll send an address in Commerce." At approximately 10:53 a.m. PST, DOMINGUEZ texted the CS, "5757 Telegraph Road, Commerce, CA 90040. Four minutes later, DOMINUEZ texted the CS, "I sent you the address." The CS then asked DOMINGUEZ for the meeting time, and DOMINGUEZ replied, "I'll be there in 10 minutes." The CS replied that he would need more than ten minutes, and the CS and DOMINGUEZ coordinated by text to meet at 11:40 a.m. PST.

18. According to surveillance notes, reports and based on my own observations, on February 8, 2023, law enforcement officers who are members of the South Gate Police Department Narcotics Unit, members of the Drug Enforcement Administration Enforcement Group 4 and South West Border 4 ("SWB4") set up surveillance to monitor DOMINGUEZ and his meeting with the CS at two locations: (1) the SUBJECT PREMISES; and (2) the Citadel

7

Outlets. Also, on that date, and prior to the CS's meeting with DOMINGUEZ, DEA special agents searched the CS for contraband and, finding none, thereafter, provided him/her with a recording device and $9,750 United States Currency.

19. According to surveillance notes and reports and based on my own observations, at 11:16 a.m., Special Agent Ricardo Martoccia observed DOMINGUEZ exit the front door of the SUBJECT PREMISES and open the driver's side rear passenger door of the SUBJECT VEHICLE and place an object into the SUBJECT VEHICLE. Agent Martoccia then observed DOMINGUEZ enter the SUBJECT VEHICLE and depart from the residence. Agent Martoccia and DEA SWB4 agents maintained surveillance on DOMINGUEZ and observed him travel uninterrupted to the Citadel Outlets.

20. Based on my conversations with Agent Duran, I know that at approximately 11:40 a.m., DOMINGUEZ called the CS and told the CS that he was at the Citadel Outlets and asked the CS if s/he was located in the Citadel Outlets parking lot or the hotel parking lot. The CS replied that s/he was in the parking lot near the hotel. DOMINGUEZ stated, "I'm in a Cherokee." The CS stated that s/he would exit his/her vehicle so that DOMINGUEZ could see him/her. DOMINGUEZ stated, "I see you," and the phone call ended.

21. At approximately 11:40 a.m., DOMINGUEZ drove the SUBJECT VEHICLE into the Citadel Outlets parking lot and parked directly next to the CS's car. Based on my review of a California Department of Motor Vehicles ("DMV") query of the SUBJECT VEHICLE's license plate, I know that the SUBJECT VEHICLE

8

is registered to M.G. at an address on Arlington Avenue in Riverside, CA.

22. According to surveillance notes and reports and based on my own observations, DOMINGUEZ exited the SUBJECT VEHICLE and opened the driver's side rear passenger door of the SUBJECT VEHICLE and retrieved a dark blue weighted plastic bag. The CS then opened the driver side rear passenger door of his/her vehicle. DOMINGUEZ then placed the dark blue weighted plastic bag into the CS's vehicle. The CS leaned inside of his/her vehicle and inspected the contents of the dark blue plastic bag. The CS counted 15 individually wrapped packages containing a crystalline substance. The CS then closed the driver side rear passenger door of his/her vehicle and handed DOMINGUEZ $9,750 in United States Currency. DOMINGUEZ and the CS concluded their meeting and DOMINGUEZ entered the SUBJECT VEHICLE and departed from the Citadel Outlets.

23. The CS then left the Citadel Outlets parking lot and drove to a predetermined location where DEA special agents collected the dark blue plastic bag from the CS. DEA special agents examined the dark blue plastic bag and saw that it contained 15 individually wrapped packages containing a crystalline substance. A TruNarc field test of the crystalline substance confirmed the presence of methamphetamine. Law enforcement later submitted the 15 packages to the DEA Southwest Laboratory for forensic analysis, which revealed that the substance was, in fact, 6.6 kilograms of methamphetamine. During the post-operation debrief, the CS notified Agent Duran

9

that s/he observed a black pistol inside of the SUBJECT VEHICLE'S center console cupholder.

24. According to surveillance notes and reports and based on my conversations with DEA Aviation Observer Taylor Igue, following the drug sale, a surveillance team including DEA special agents, South Gate Police Department detectives and a DEA airship followed DOMINGUEZ to the SUJECT PREMISES. DOMINGUEZ parked the SUBJECT VEHICLE in the driveway of the SUBJECT PREMISES and exited the SUBJECT VEHICLE. The DEA Airship was able to see DOMINGUEZ enter the front door of the SUBJECT PREMISES. DOMINGUEZ left the dark blue plastic bag in the SUBJECT VEHICLE. Surveilling officers continued to watch the SUBJECT PREMISES for a period of time and did not see anyone enter or exit the SUBJECT PREMISES.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

25. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their

vehicles in the event of an unexpected opportunity to sell narcotics arises.

      f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

      g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus, may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

      h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a

15

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress DOMINGUEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of DOMINGUEZ's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

29.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

30.  For all of the reasons described above, there is probable cause to believe that DOMINGUEZ committed the Subject Offenses.  There is also probable cause to believe that the items to be seized described in Attachment B will be found in a

16

search of the SUBJECT PREMISES, the SUBJECT VEHICLE, and DOMINGUEZ's person described in Attachments A-1, A-2, and A-3.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 17th day of
March, 2023.

_____
THE HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE

17